[No. B081544. Second Dist., Div. Two. Dec. 1, 1998.]

PEGGY ANN BUCKLEY et al., Plaintiffs and Respondents, v. CALIFORNIA COASTAL COMMISSION, Defendant and Appellant.

PEGGY ANN BUCKLEY et al., Cross-complainants and Respondents, v. CALIFORNIA COASTAL COMMISSION, Plaintiff, Cross-defendant and Appellant.

182

**COUNSEL**

Daniel ·E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Jan S. Stevens, Assistant Attorney General,

Alan V. Hager, Joseph Barbieri, Matthew Rodriguez and Terry T. Fujimoto, Deputy Attorneys General, for Defendant and Appellant and for Plaintiff, Cross-defendant and Appellant.

Thomas M. Banks, Shapiro, Rosenfeld & Close, Eliot G. Disner and Elizabeth E. Webb for Plaintiffs and Respondents and for Cross-complainants and Respondents.

---

**OPINION**

**NOTT, J.—**

### I.

The California Coastal Commission (Commission) appeals from a judgment awarding $2,187,331.76 in damages, attorney fees and costs to respondents Peggy Ann and John Buckley for the taking of their property without compensation.[1]

We affirm the trial court's ruling that the Commission had no jurisdiction over the rear portion of the Buckleys' lot. However, the damage award is reversed because the evidence does not establish that the mistaken assertion of jurisdiction by the Commission amounts to a taking. (*Landgate, Inc.* v. *California Coastal Com.* (1998) 17 Cal.4th 1006 [73 Cal.Rptr.2d 841, 953 P.2d 1188].) For the reasons stated below, we also reverse the award of attorney fees.

### II. FACTS AND PROCEDURAL HISTORY

In January 1988, the Buckleys purchased an undeveloped lot in Malibu, which was at the time an unincorporated area of the County of Los Angeles (County). The Buckleys intended to build a single-family residence on the lot, which is located in an established single-family residential community. They were informed by their real estate broker that the lot was exempt from review or regulation by the Commission for construction of a single-family residence. The Buckleys paid $485,000 for the property, and they invested between $200,000 and $300,000 adding electricity, water, gas, a fence, a septic system, and a foundation for the garage to the property; and having the building and grading plans developed.

---

[1] According to a declaration filed in November 1996 by counsel for John Buckley, the Buckleys are married but have been separated and estranged for many months. Peggy Ann Buckley had her own attorney for the damages phase of the trial, and continues to be represented by separate counsel on appeal. We will refer to the Buckleys separately when their arguments on appeal require it.

The lot is 2.75 acres and rectangular in shape, running lengthwise from east to west. The front portion of the lot is a level area of about 1.15 acres that descends into a steep ravine in the westerly or rear portion, covering about 1.6 acres. Before it was purchased by the Buckleys, significant road grading had occurred on the west portion of the lot, including a road cut along the slope of the ravine's north side wall.

In November 1988, the Buckleys retained a soils engineering firm. The geological engineer, Dale Glenn, testified that she first visited the site in 1988 with the soils engineer, who "indicated that there were some stability problems with the canyon and that in order to accomplish development of the site, that it would be very likely that the canyon would have to be filled in and that we needed a study in that canyon." However, Glenn described the original grading plan, trial exhibit 30, as a plan for grading the front portion of the lot. In her direct testimony, she was asked whether, as of February 27, 1990, "would it have been possible for the Buckleys to develop their property by simply grading the portion of the property shown in exhibit 30 and constructing the residence that was permitted in 1989?" Glenn replied, "Yes."

Meanwhile, although they did not yet have grading plan approval, by August 15, 1989, the Buckleys had stockpiled fill dirt on the front portion of the lot. On that date, the Buckleys received a letter from the Commission stating that the property was located in the coastal zone, and that a coastal development permit was required for any development. On August 25, in response to the Buckleys' answer to its earlier letter, the Commission agreed that the County had the authority to exempt from coastal development permits development projects involving new single-family homes.[2]

A subsequent letter from the Commission stated that because the rear portion of the lot was in an environmentally sensitive habitat area (ESHA), the rear portion was not part of the exemption. The Buckleys were informed that they could either seek a coastal development permit or submit to the Commission a valid exemption issued by the County. They were warned that if they chose the latter, they would not be allowed to develop the rear of the property where the ravine is located.

The Buckleys replied that they were not developing the rear portion of the lot and that if they decided to do so in the future, they would seek a coastal development permit.

---

[2]The exemption is known as a "Calvo exclusion" after the former state assemblyman who sponsored the legislation permitting the exemption, which is codified at Public Resources Code sections 30610.1 and 30610.2.

All further statutory references are to the Public Resources Code unless otherwise stated.

The County issued the exemption on October 24, 1989. The Buckleys' plans for grading the front portion of the lot and building a residence of 15,000 square feet were approved by the County.

In the fall of 1989, the Buckleys decided to sell the lot rather than build on it. They were advised by real estate brokers in the area that a dispute with the Commission would have a negative impact on the selling price. John Buckley testified that he was told that with a permit to build, the property was worth between $1.5 and $2 million.

The Buckleys' expert, Frederick Chin, a real estate consultant and appraiser, testified that the land value appreciated approximately 115 percent a year between January 1988 and May 1990, and that the lot was worth $1.3 million in May 1990.

A new grading plan, dated February 1990 and referred to as exhibit No. 31 at trial, was readied for submission to the County. It called for three building pads in the rear section of the lot: two pads in the ravine and one on the ridge. The pads were to be for a garden, a riding ring or tennis court, and a guest house. The plan was submitted to the County in April 1990, but not submitted to the Commission until October 1990.

Dale Glenn testified that the new grading plan would have stabilized the ravine. However, she admitted on cross-examination that the plan was designed to increase usable space. She said, "The canyon was unstable, it needed to be stabilized, that was going to create a great expense for the Buckleys and to offset some of that expense, we recommended that they do a grading solution that would gain saleable or some usable land on the property as opposed to some other method which we hadn't explored even at that time . . . for instance, soldier piles would put a great expense on the site and produce nothing."[3]

In February 1991, the Commission's staff report recommended denial of the request because the development would be inconsistent with the ESHA policies of the California Coastal Act of 1976 (§ 30000 et seq. (Coastal Act)). Glenn testified that a few days after the rain in March 1991, just before the Commission's March 13 hearing on the permit application, she discovered a landslide condition on the lot. The Buckleys informed the

---

[3]Donald Kowalewsky, an engineering geologist called to testify for the Commission, explained that soldier piles are reinforced concrete caissons, two feet in diameter, with a steel reinforcement beam down the center. In this case, the piles could be placed in the ground near the top of the slope and extend to a depth of about 40 feet, which would prevent future deterioration of the slope from undermining the driveway or the rest of the improved properties to the south of the area of the landslide.

commissioners that a landslide had developed in the ravine and that it threatened the adjacent properties. The Commission denied the application. The Buckleys did not appeal the Commission ruling.

Just after the Commission's denial, the County determined that the Commission had no jurisdiction over any portion of the lot. As testified to by Dale Glenn, the County approved the later grading plan, exhibit No. 31, on March 19, 1991. The Buckleys began grading the lot. The Commission sent a stop work order in March 1991 which stated: "RE: Grading in a canyon, outside the exclusion area with valid coastal development permit." The order notified the recipient "to stop all work. Any additional unpermitted work on this site will be considered . . . a violation of the Coastal Act." Shortly after that, Malibu became an incorporated city, and a grading and construction moratorium was imposed on all city properties.

At some point, the Buckleys decided to grade the rear portion of the lot based on the County approval they received. In June 1991, the Commission again hand delivered a stop work order. The order notified the Buckleys "to stop all unpermitted work. No grading is permitted on this property. A Coastal Permit has not been issued for this project."

In August 1991, the Attorney General sent a letter to the attorney who represented the Buckleys at the Commission hearing. The letter stated that "the Commission denied their permit application to develop the rear portion of their lot . . . . Despite the denial and a stop work notice . . . the Buckleys have continued to perform grading and filling on the site in violation of the Coastal Act."

In November, after a County geologist observed an unstable natural slope on the rear of the lot and the County ordered the Buckleys to abate the landslide that was occurring there, they resumed grading. They also filed for an emergency permit with the Commission on the basis that there was a landslide condition that needed immediate attention. An engineer from the Commission and a geologist from the City inspected the lot and concluded that the landslide condition did not pose an imminent threat but was a normal consequence of the rains. The engineer and the geologist also concluded that the grading plan submitted by the Buckleys was not the minimum necessary to mitigate the geological conditions. The Commission denied the emergency request on those grounds. The Buckleys continued grading from November 27, 1991, until the Commission issued the final stop work order on December 5, 1991. It again stated that they had to "stop all unpermitted work. No grading or construction or landfill is permitted on this property. A Coastal Permit has not been issued for this project."

The Buckleys filed this declaratory relief action in December 1991. The Commission subsequently filed an action for injunctive relief and civil penalties and fines. The Buckleys cross-complained in that case for declaratory relief and damages. The cases were consolidated, and the Buckleys' initial action was found to be the lead case. That matter was then severed from the rest of the action, and a court trial proceeded.

In the declaratory relief action, the court held that the Commission had no jurisdiction over the lot. The Buckleys' motion to sever that action from the cross-complaint was granted. The trial court entered a final judgment in the declaratory relief action, and the Commission filed a notice of appeal.

Subsequently, the Buckleys placed the lot on the market for a sale price of $1.4 million by order of the family law court.

Trial proceeded on the Buckleys' cross-complaint for damages. The trial court awarded them $1,355,837 in damages for the permanent taking of their property, and $831,494.76 in attorney fees, appraiser fees and costs.

### III. Contentions

We will address the following contentions raised by the Commission: (1) the Buckleys' complaint for declaratory relief challenging the Commission's jurisdiction over the property is barred by their failure to file a writ of mandate petition challenging the Commission's permit decision; (2) the trial court erroneously determined that the rear portion of the Buckleys' lot was exempt from the permit requirements of the Coastal Act; (3) the Buckleys' taking claim is barred by their failure to seek a writ of mandate challenging the Commission's jurisdiction; (4) even if the Commission wrongfully asserted jurisdiction over the property, its actions did not constitute a per se taking of the property; (5) section 30005 has no application to the issue of whether the Commission engaged in a taking; (6) the Buckleys are not entitled to attorney fees because there was no taking; and (7) the trial court was biased against the Commission. In light of our resolution of these issues, we need not discuss the Commission's argument that the trial court erroneously calculated the amount of damages.

### IV. Discussion

#### A. *The Declaratory Relief Action Is Not Barred by the Failure to File a Writ Petition*

The Commission begins its argument with a citation to section 30801, which provides: "Any aggrieved person shall have a right to judicial

review of any decision or action of the commission by filing a petition for a writ of mandate in accordance with Section 1094.5 of the Code of Civil Procedure, within 60 days after the decision or action has become final." Asserting that the Buckleys' permit application was denied on March 15, 1991, and that they failed to file a writ petition challenging the assertion of jurisdiction by May 15, 1991, or anytime after, the Commission contends that the declaratory relief action collaterally attacking the Commission's jurisdiction is barred as a matter of law.

The trial court rejected the Commission's argument on the ground that the Commission did not have jurisdiction over the lot at the time the permit was denied; and, therefore, the Buckleys were not required to file a writ petition. Thus, the question before us is whether the statutes creating the exemption from coastal development permits allow a partial lot exemption, which is the basis of the Commission's position; or whether an exemption of any portion of a lot is an exemption of the whole lot, which is the heart of the Buckleys' argument.

### 1. *Statutory language*

■ " ' "[O]ur first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import . . . . The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists, consideration should be given to the consequences that will flow from a particular interpretation. [Citation.] Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent. . . . [Citations.]" ' [Citation.]" (*Central Pathology Service Medical Clinic, Inc.* v. *Superior Court* (1992) 3 Cal.4th 181, 186-187 [10 Cal.Rptr.2d 208, 832 P.2d 924].)

■ Section 30610.1 required, within 60 days of its effective date, January 1, 1980, the Commission to designate areas in the coastal zone where construction of a single-family residence on a vacant lot meeting certain criteria would not require a coastal development permit. "Areas shall be designated for the exclusion provided for in this section if construction of single-family residences within the area to be designated has no potential, either individually or cumulatively, for significant adverse impacts on . . . environmentally sensitive areas . . . ." (§ 30610.1, subd. (b).)

Subdivision (c) of section 30610.1 provides that no coastal development permit is required for the construction of a single-family residence on any vacant lot which meets certain criteria, including if it: "(2) Is a legal lot as of the effective date of this section and conforms with the minimum lot size and lot use designations of the applicable general plan and zoning ordinances."

Pursuant to section 30610.2, subdivision (a), a local government with jurisdiction over a lot issues a written certification that the lot is exempt from the coastal development permit requirement because the lot meets the criteria specified in subdivision (c) of section 30610.1.

According to the analysis of the proposed legislation by the Assembly Committee on Resources, Land Use, and Energy, the Coastal Act required a permit for construction of any structure in the coastal zone. The requirement was "criticized as overly-stringent when applied to the construction of single-family residences in coastal areas which are already substantially developed for residential purposes." Pursuant to the proposed new sections, in unincorporated areas such as Malibu at that time, once the Commission designated specific zones, "all lots within such areas or zones would be exempt from the permit requirement for single-family residences."

The purpose of the legislation was to allow owners of lots in designated areas to build single-family residences without having to obtain a coastal development permit from the Commission. Sections 30610.1 and 30610.2 had the effect of eliminating the Commission's participation in the approval process for construction of single-family residences within the designated areas.

There is no provision that allows the Commission to designate a portion of a lot as being within sections 30610.1 and 30610.2. Both statutes use the term "a vacant lot." Once the Commission determined that a lot was within the single-family residence construction area, nothing in the statute permitted the Commission to retain jurisdiction over the decision to develop any part of that lot. If the Commission wanted to retain control over whether to allow improvements in the southwest corner of the Buckley lot, it had no alternative but to place the entire lot outside the area designated for single-family residence construction. By placing the lot within that area, the Commission forfeited its control and its discretion to approve or disapprove construction on that lot.

To hold otherwise would not only add provisions to the statutes that were not included by the Legislature, it would also inhibit the legislative purpose

of the statute. If a portion of a lot placed within the single-family residence construction area is subjected to the coastal development permit process, the owners must go through the Commission to improve their property. The very purpose of the statutes at issue here was to avoid that. We therefore hold that when the Commission, acting pursuant to section 30610.1, placed any portion of a lot within the single-family residence construction area, it placed the entire lot within that area. By placing a lot within the single-family residence construction area, the Commission thereby relinquished jurisdiction over development decisions regarding the entire lot.

### 2. *The Buckleys were not required to file a writ petition*

" '[A] matter within the commission's jurisdiction' " is any "quasi-judicial matter requiring commission action . . . ." (§ 30321.) Because the Commission had no role in the construction permit process regarding the Buckley lot, it follows that the Commission has no jurisdiction over the Buckley lot.

As stated in *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288 [109 P.2d 942, 132 A.L.R. 715], lack of jurisdiction is "an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties." That is an apt description of the relationship between the Commission and the Buckleys' single-family residence construction on the lot.

█ Subject matter jurisdiction cannot be conferred by consent, waiver or estoppel. (*Summers v. Superior Court* (1959) 53 Cal.2d 295, 298 [1 Cal.Rptr. 324, 347 P.2d 668]; *National Union Fire Ins. Co. v. Stites Prof. Law Corp.* (1991) 235 Cal.App.3d 1718, 1723 [1 Cal.Rptr.2d 570]; *Rowland v. County of Sonoma* (1990) 220 Cal.App.3d 331, 333 [269 Cal.Rptr. 426].) █ Therefore, the fact that the Buckleys filed an application for a coastal development permit and the Commission denied the application did not confer on the Commission jurisdiction over the improvement of the lot. Because the Commission had no authority to deny the permit, the Buckleys were not required to seek judicial review of the denial. We do not disagree with any of the authorities cited by the Commission for the proposition that failure to obtain judicial review of a determination by an administrative agency by a timely petition for writ of administrative mandate renders the administrative action immune from collateral attack. (See, e.g., *Rezai v. City of Tustin* (1994) 26 Cal.App.4th 443, 448 [31 Cal.Rptr.2d 559]; *Patrick Media Group, Inc. v. California Coastal Com.* (1992) 9 Cal.App.4th 592, 602 [11 Cal.Rptr.2d 824]; *California Coastal Com. v. Superior Court* (1989) 210

Cal.App.3d 1488, 1498 [258 Cal.Rptr. 567].) We simply hold that the cases do not apply here.[4]

█ The rule of exhaustion of administrative remedies does not apply where the subject matter lies outside the administrative agency's jurisdiction. (*Public Employment Relations Bd.* v. *Superior Court* (1993) 13 Cal.App.4th 1816, 1827 [17 Cal.Rptr.2d 323]; *Residents for Adequate Water* v. *Redwood Valley County Water Dist.* (1995) 34 Cal.App.4th 1801, 1808 [41 Cal.Rptr.2d 123].) █ The Commission had no power to deny the Buckleys permission to improve any portion of their lot. Because it lacked power to make any determination, the denial of a permit to the Buckleys was a void act that could be set aside at any time. (See *Becker* v. *S.P.V. Construction Co.* (1980) 27 Cal.3d 489, 493 [165 Cal.Rptr. 825, 612 P.2d 915].)

B. *The Takings Claim Is Not Barred by the Failure to File a Writ Petition*

█ The Commission next argues that their failure to challenge the Commission's permit decision bars the Buckleys from claiming that the Commission's assertion of permit jurisdiction resulted in a taking of their property. The Commission cites the same authorities relied on in the preceding contention. This argument, like the earlier one, is based on the premise that the Commission had jurisdiction. Our conclusion that the Commission did not have jurisdiction when it denied the permit, and that the matter falls within an exception to the doctrine of exhaustion of administrative remedies, disposes of this issue as well.

C. *The Trial Court Erred in Finding That the Commission's Assertion of Jurisdiction Over the Buckley Lot Was a Taking*

█ After ruling that the Commission's prohibition against grading did not advance a legitimate state interest and denied the Buckleys any economically viable use of the lot, the trial court found that the Commission's assertion of jurisdiction over the development of the lot was a per se permanent regulatory taking of the Buckleys' property. The Commission is correct in its contention that the ruling by the trial court was erroneous, because the ruling is not supported by substantial evidence.

---

[4]The Commission also cites a series of cases, *Hensler* v. *City of Glendale* (1994) 8 Cal.4th 1, 13-14 [32 Cal.Rptr.2d 244, 876 P.2d 1043], among them, to argue that res judicata bars the Buckleys' declaratory relief action. We do not agree that *Hensler* would support such a statement, but we need not discuss it or any of the other cases cited to support this contention. Our conclusion that the Commission had no jurisdiction over any improvements on the lot completely resolves in favor of the Buckleys the issue of whether the declaratory relief action was barred.

### 1. *The substantial evidence test*

■ Review of condemnation proceedings tried before the court requires the appellate court to determine whether there is any substantial evidence to support the findings. (*City of Commerce* v. *National Starch & Chemical Corp.* (1981) 118 Cal.App.3d 1, 18 [173 Cal.Rptr. 176].) The substantial evidence rule applies as well on review from inverse condemnation proceedings. (See *Patrick Media Group, Inc.* v. *California Coastal Com., supra,* 9 Cal.App.4th 592, 605 [appellate court bound by implied finding of fact supported by substantial evidence].)

Substantial evidence is not any evidence, but substantial proof of the essentials which the law requires in a given case. (*Roddenberry* v. *Roddenberry* (1996) 44 Cal.App.4th 634, 651 [51 Cal.Rptr.2d 907].) Substantial evidence has ponderable legal significance, is reasonable, credible and of solid value. (*Kuhn* v. *Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 [29 Cal.Rptr.2d 191].) We focus on quality, not quantity, because very little solid evidence might be substantial, while a host of extremely weak evidence might be insubstantial. (*Roddenberry* v. *Roddenberry, supra,* at p. 651.) Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence. (*Ibid.*) The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record. (*Kuhn* v. *Department of General Services, supra,* at p. 1633.)

### 2. *The takings law*

■ Governments are prohibited from taking private property for public use without compensation. (U.S. Const., 5th and 14th Amends; Cal. Const., art. I, § 19.) To obtain compensation, the property owner may bring an action for inverse condemnation. (*United States* v. *Clarke* (1980) 445 U.S. 253, 257 [100 S.Ct. 1127, 1130, 63 L.Ed.2d 373] [inverse condemnation is an action to recover compensation for taking of property by means other than condemnation proceedings].) In an inverse condemnation action, the property owner has the burden of alleging and proving the owner's property right and its infringement. (*Gilbert* v. *State of California* (1990) 218 Cal.App.3d 234, 249-250 [266 Cal.Rptr. 891]; *People* ex rel. *Dept. Pub. Wks.* v. *Romano* (1971) 18 Cal.App.3d 63, 72, fn. 4 [94 Cal.Rptr. 839].)

■ The mere assertion of regulatory jurisdiction by a governmental body does not constitute a taking. (*United States* v. *Riverside Bayview Homes, Inc.* (1985) 474 U.S. 121, 126-127 [106 S.Ct. 455, 459, 88 L.Ed.2d 419].) The requirement that a person obtain a permit before engaging in a

certain use of the property does not itself take the property; the very existence of a permit system implies that permission may be granted to allow the owner to use the property as desired. Even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent economically viable use of the land in question can it be said that a taking has occurred. (*Ibid.; Dolan* v. *City of Tigard* (1994) 512 U.S. 374, 385 [114 S.Ct. 2309, 2316-2317, 129 L.Ed.2d 304] [land use regulation does not effect a taking if it substantially advances legitimate state interests or does not deny owner economically viable use of the land]; *Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. 1003, 1015-1016 [112 S.Ct. 2886, 2893, 120 L.Ed.2d 798] [Fifth Amendment violated when land use regulation denies owner economically viable use of land]; *Agins* v. *Tiburon* (1980) 447 U.S. 255, 260-262 [100 S.Ct. 2138, 2141-2142, 65 L.Ed.2d 106].)

For example, in *Lucas* v. *South Carolina Coastal Council*, a statute entitled the "Beachfront Management Act," enacted after the property owner purchased two residential beach front lots, barred the owner from building any permanent habitable structures. The Supreme Court held that "[w]here the State seeks to sustain regulation that deprives the land of all economically beneficial use" (505 U.S. 1027 [112 S.Ct. at p. 2899]), the state must compensate the owner for taking the property. However, as noted by our Supreme Court in *Kavanau* v. *Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 774 [66 Cal.Rptr.2d 672, 941 P.2d 851], a regulation may effect a taking even if it leaves the owner some economically beneficial use of the property. *Kavanau* cites to footnote 8 in *Lucas* v. *South Carolina Coastal Council*, wherein the United States Supreme Court left open the possibility of a taking where the deprivation caused by a regulation "is one step short of complete." (*Lucas* v. *South Carolina Coastal Council, supra*, 505 U.S. at p. 1019, fn. 8 [112 S.Ct. at p. 2895.)

Whether the owner has been denied substantially all economically viable use of the property is a factual inquiry that requires the analysis of such factors as the economic impact of the regulation, interference with the landowner's reasonable, investment-backed expectations and the character of the government action. (*Kaiser Aetna* v. *United States* (1979) 444 U.S. 164, 175 [100 S.Ct. 383, 390, 62 L.Ed.2d 332].) The basis of the inquiry is the owner's entire property holdings at the time of the alleged taking, not just the adversely affected portion. (*Keystone Bituminous Coal Assn.* v. *DeBenedictis* (1987) 480 U.S. 470, 497 [107 S.Ct. 1232, 1248, 94 L.Ed.2d 472].)

Temporary takings which deny a landowner all use of property are not different in kind from permanent takings, for which compensation is clearly

required. (*First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304, 318 [107 S.Ct. 2378, 2387, 96 L.Ed.2d 250].) The *First Lutheran* court repeatedly used the term "all uses" to describe a temporary taking. Later United States Supreme Court permanent regulatory takings cases, such as those cited above, have employed expressions more favorable to the showing that must be made to establish a taking, such as " 'economically viable use of [the] land' " (*Dolan* v. *City of Tigard, supra*, 512 U.S. at p. 385 [114 S.Ct. at p. 2316]) and "all economically beneficial or productive use of land" (*Lucas* v. *South Carolina Coastal Council, supra*, 505 U.S. at pp. 1015-1016 [112 S.Ct. at p. 2893]).

### 3. *The application of the substantial evidence rule and the law of takings to this case*

 The trial court's determination that there was a permanent taking of the Buckleys' property was incorrect. After the trial court ruled that the Commission had no jurisdiction over the lot, the Commission's stop work orders no longer had any effect. Any taking that might have occurred was ended by that ruling. There is no basis in the facts, in the law, or in logic that would support the view that a permanent taking occurred in this case. We turn to the question of whether there was a temporary taking of the Buckley property.

The evidence established that until the County approved exhibit No. 31 after the landslide formed in March 1991, the Buckleys had valid building and grading permits for the front portion of the lot. Pursuant to the County permits, the Buckleys or a subsequent owner were entitled to proceed with the construction of the 15,000-square-foot house that the Buckleys' plans called for. The Commission asserted jurisdiction only over the rear portion of the property, where the ravine is located. The Commission acknowledged that the front portion of the lot was subject to County jurisdiction pursuant to the Calvo exclusion, a point not in dispute after the exemption was issued by the County in October 1989. Indeed, the initial grading permit the Buckleys sought from the Commission concerned only the rear portion of the lot. The Buckleys, however, chose not to grade and chose to build on only the front portion of the lot. Dale Glenn testified that the later grading and building plan, exhibit No. 31, was developed in part because the ravine had to be stabilized. However, the County had already approved the Buckleys' plan to build a 15,000-square-foot house on the property without requiring any grading in the ravine area. The Buckleys could have built or sold the property before submitting exhibit No. 31 to the County.

Subsequently, exhibit No. 31 was approved by the County. From this the Buckleys argue that the earlier grading and building plan, exhibit No. 30,

was superseded and, because of the Commission's refusal to allow them to grade the rear of the lot they were not entitled to build at all after March 1991. However, the Buckleys did not establish that the County would not have been willing to allow them to execute the earlier approved plan, exhibit No. 30, after the Commission did not approve the application to grade the rear of the lot pursuant to exhibit No. 31.

Because the Buckleys could have developed the front portion of the lot, or sold the lot with the County permits in place, the grading restriction imposed by the Commission, though erroneous, did not prevent all economically viable or productive use of the lot even before the Buckleys obtained a successful result in the declaratory relief portion of the trial. Therefore, the record does not support a finding that there was a temporary taking in this case.

### a. *The impact of the landslide on the taking analysis*

To support the trial court's ruling, Peggy Ann and John Buckley both assert that after the landslide developed in the ravine, the Commission's prohibition against grading the rear of the lot effected a taking of the entire lot because, at that point, the front portion of the property could not have been developed without grading the entire property. The evidence supports the position that the landslide changed the situation on the rear portion of the lot and made grading a necessity. The evidence does not support the argument that, as a result, a taking occurred.

Peggy Ann states that after the landslide, "any development of the Lot would require the landslide to be mitigated." Both respondents rely on the testimony of Dale Glenn, who stated that after the landslide she could not provide to the County a report required by the Los Angeles County Building Code, stating that no conditions on the property would adversely affect the adjoining properties. However, other portions of Ms. Glenn's testimony bring into question the Buckleys' premises: first that the grading plan they submitted to the Commission was the only plan that would have remedied the landslide, and second that the Commission's failure to approve that grading plan the Buckleys submitted caused them to be unable to build at all and thus effected a taking.

Glenn testified that exhibit No. 31 was designed to create more usable space for the Buckleys, to offset some of their expense. However, she did not testify that after the Commission's rejection of the exhibit No. 31 grading plan she attempted to modify exhibit No. 31 in any way in order to obtain approval for grading the ravine area with perhaps only one or two pads.

The Glenn testimony undercuts the Buckleys' position, as does the testimony of the Commission's engineering geologist, Donald Kowalewsky. Kowalewsky testified that the rear portion of the lot could have been graded in a way that would have stabilized the ravine with substantially less grading than the Buckley's proposed grading plan. He recommended removing all the landslide material and additional earth to a depth of 12 feet, and replacing it with compacted fill. Drains would be placed within the fill to prevent the groundwater from building up behind the fill. The fill would be placed within a reinforcing geofabric that would stabilize the fill and prevent it from undergoing superficial instability such as the slide currently taking place on the property.[5] According to Kowalewsky, when finished, the slope would be landscaped to have a natural look. He stated that this proposal would require "substantially less grading" than the Buckleys' plan.

In fact, the Buckleys did not attempt to work with the Commission to develop a plan that would require less grading of the ravine. The Commission's permit application reviewer, Barbara Carey, testified that the Buckleys' permit denial was not a denial of all development. The Buckleys had the option of submitting a different grading plan. At that point, the court commented that the Buckleys "did not want to." But, as noted by the Commission's counsel, the Buckleys had a duty to mitigate their damages. Carey stated that the Buckleys never applied for a grading permit with a plan for less development.

Carey also testified that, as a permit application reviewer, "something like" Kowalewsky's suggestion that the failed earth material be removed and replaced with a compact fill, reinforced by geofabric and subdrains "would more likely be recommended for approval."[6] She was also asked about Kowalewsky's idea that a retaining structure such as soldier piles be placed along the edge of the driveway. Again she stated that such a plan would be more likely to be recommended for approval, and she testified that it would be less intrusive to the environmentally-sensitive habitat area.

Therefore, the evidence at trial did not support the Buckleys' position. The grading plan the Buckleys wanted was not necessarily the only one that would accomplish the goal of stabilizing the ravine. The Commission's

---

[5]The geofabric was described as "a webbed net of a specialized plastic material that does not deteriorate . . . . It is typically placed about two feet apart, vertically, and it provides additional strength to the soil such that the soils will not sheer or break across or through this fabric material."

[6]In her petition for rehearing, Peggy Ann argues that Kowalewsky's testimony was unreliable in part because Dale Glenn had testified that the County does not allow geofabric. At that time, however, it was the Commission, not the County, that the Buckleys had to work with in order to develop an approved grading plan for the rear of the lot.

denial was not unreasonable, and no evidence indicated that the Commission would not entertain a different grading approach. The denial of the grading plan submitted to stabilize the landslide was not a taking.

### b. *The effect of section 30005*

Both Peggy Ann and John contend that the Commission interfered with their efforts to abate the landslide, in violation of section 30005, which provides that no provision of the Coastal Act "is a limitation . . . [¶] . . . [¶] (b) On the power of any city or county . . . to declare, prohibit, and abate nuisances." Even if true, such violation of section 30005 could not have caused a taking, in light of our conclusion that the evidence does not show that the Commission was against any grading of the ravine whatsoever. The record shows that the Commission denied the first and only grading plan submitted by the Buckleys, one that, according to the testimony of the Buckleys' geological engineer, was designed to gain more usable land while stabilizing the ravine.

### c. *The Buckleys' interpretation of the stop work orders was not reasonable*

Peggy Ann also argues that the Commission's stop work orders were not limited to the rear areas of the lot, but related to the entire lot. She cites in support the testimony of the Commission's enforcement officer, Pam Emerson, who admitted that the December 1991 stop work order did not state that it was limited to the ESHA area. However, Peggy Ann ignores other testimony on this point.

The March 1991 stop work order stated: "RE: Grading in a canyon, outside the exclusion area with valid coastal development permit." The order notified the recipient "to stop all work. Any additional unpermitted work on this site will be considered . . . a violation of the Coastal Act."

The June 1991 stop work order notified the Buckleys "to stop all unpermitted work. No grading is permitted on this property. A Coastal Permit has not been issued for this project."

The August 1991 letter from the Office of the Attorney General to the attorney for the Buckleys at the Commission hearing stated that "the Commission denied their permit application to develop the rear portion of their lot . . . . Despite the denial and a stop work notice . . . the Buckleys have continued to perform grading and filling on the site in violation of the Coastal Act."

Finally, the December 1991 stop work order again stated that the Buckleys had to "stop all unpermitted work. No grading or construction or landfill is

permitted on this property. A Coastal Permit has not been issued for this project."

Although the June and December stop work orders do not refer specifically to the rear portion of the lot, the March stop work order did, as did the letter from the Attorney General's Office. Pam Emerson, the enforcement officer for the Commission, testified that the letters did not refer to the rear of the lot because the Commission knew that the Buckleys had a Calvo exclusion for the front portion of the lot.

John admitted that the Commission never stated that it was asserting jurisdiction over the entire lot. Peggy Ann testified that after the August 1991 letter, she believed that she had the right to develop the property, but she believed the Commission would never leave them alone. She admitted, however, that she did not contact the Commission to determine whether the stop work orders referred to the whole lot. In fact, no one contacted the Commission on behalf of the Buckleys to clarify this point—not the lawyer they hired to appear before the Commission, not the facilitator they hired to move their permit through the Commission, not the lawyers they hired to pursue this litigation. Moreover, John testified that they put in electricity, water, gas, a fence, a septic system and a foundation for the garage on the exempt portion of the lot, but there was no evidence that the Commission interfered with any of that work. Therefore, we conclude that there was no evidentiary basis for the Buckleys' position that the Commission was prohibiting them from doing any work on the lot.

d. *The Buckleys did not establish that the permits are no longer valid*

Peggy Ann contends that if the Buckleys were required to modify the approved County plans to accommodate a different grading plan after the change of jurisdiction from the County to the City of Malibu, they would probably have to start the permit process over again. However, the Buckleys did not establish whether the City of Malibu would in fact require them to start the process again.

The Buckleys' appraiser, Mr. Chin, testified that he did not check with the City or the County to determine whether the permits issued by the County were still valid at the time of trial. The Buckleys called Grant Lawseth, who is with the County Building and Safety Division, who testified that the City of Malibu was honoring building permits issued by the County, though he was not sure about grading permits. On cross-examination, he testified that he did not know whether the Buckleys tried to determine whether their County permits are still valid. In fact, the court itself noted that there was no

evidence on the question of whether the City of Malibu would honor the permits issued to the Buckleys. It was, however, the Buckleys' burden to establish that, and there was no evidence that they could not still build according to the County-approved plans.

### e. *The Landgate Decision*

Finally, the recent decision of our Supreme Court in *Landgate, Inc.* v. *California Coastal Com., supra,* 17 Cal.4th 1006 precludes any monetary recovery by the Buckleys. Boiled down to its essence, *Landgate* held that, under the facts presented, an incorrect decision of the Commission in asserting jurisdiction over property did not constitute a temporary taking.

### (1) *Facts*

Landgate is a developer which purchased land in Malibu that was subject to the Coastal Act, and thus to the concurrent jurisdiction of the County and the Commission.

Landgate proposed to grade its north lot and build a large residence, which would include a guest house and a swimming pool. The County gave its blessing to the project.

Landgate applied to the Commission for a permit, which was denied on three grounds: (a) the visual impact of the project on the environment, (b) excessive amounts of grading, and (c) an illegal lot line.

Of the three reasons, the lot line adjustment was the sticking point. Landgate had previously received County permission to revise the lot lines of property it owned because of a road which had been constructed in the area. The Commission regarded the County's action as illegal. The County believed that the Commission had waived its right to object by acquiescing in the construction of the road.

Subsequently, Landgate revised its project to alleviate any problems regarding visibility and grading. The Commission denied the project once again, with the lot line adjustment still being the major problem.

Landgate then filed two actions. The first was a writ of mandate based on the argument that the Commission had no jurisdiction over the lot line adjustment. The second was a complaint for damages for a "taking" without just compensation.

The trial court granted the writ of mandate, holding that the lot line adjustment was not within the Commission's purview. The trial court ordered the Commission to rehear the application on its merits. The Court of

Appeal affirmed, holding that the Government Code did not authorize the Commission to invalidate a legally recorded lot line adjustment to which the Commission had given tacit approval.

In February of 1993, Landgate's project (modified again) was approved, subject to conditions relating to height limits, drainage, color and landscaping, to which Landgate did not object.

Both sides then filed for summary adjudication on Landgate's "takings" complaint. The trial court found that the Commission's erroneous assertion of jurisdiction prevented the use of the property from February of 1991 until February of 1993 and awarded damages of $155,657. The Commission appealed. Landgate also appealed that the damages were too low.

### (2) The decision

The Supreme Court granted review to decide a single issue: Whether the Commission's mistaken assertion of jurisdiction led to a temporary taking.

For better or for worse, in a four-to-three decision, the majority held that a legally erroneous decision of a governmental agency during the development approval process that results in a delay of the permit is not a taking, as long as there is an objective, sufficient connection between the land use regulation in question and a legitimate governmental purpose. (*Landgate, Inc.* v. *California Coastal Com., supra*, 17 Cal.4th 1006, 1022.)[7]

The Supreme Court stated that a mere assertion of regulatory jurisdiction did not equate to a regulatory taking. (17 Cal.4th at p. 1027.) "[W]hen the Commission determined that Landgate's lot was not legal, it could legitimately litigate the lot line question without offending the takings clause. The Commission could not be said to have reached a final and authoritative determination of the development on Landgate's lot until after the dispute about the legality of the lot had been resolved." (*Id.*, at p. 1029.)

Further, the Supreme Court said that the reality of the application process is that, on occasion, disputes will lead to judicial proceedings. However, so long as such proceedings are not brought on by the arbitrary or capricious acts of the governmental agency, the delay in approval occasioned by judicial proceedings is simply an unfortunate part of the normal process. (17 Cal.4th at pp. 1029-1032.)

---

[7]Justice Chin and Justice Brown each wrote separate dissents, and each was joined by Justice Baxter. The thrust of each dissent is that when a regulatory agency prohibits all use of a particular property and the owner is forced to sue the agency to achieve the correct result, a compensable taking has occurred. Further, litigation over land use is not a "normal delay."

### (3) *Application of Landgate*

 As in *Landgate*, the present case likewise involves the mistaken assertion of jurisdiction by the Commission. In the previous part of this opinion at part A.1., we have held, in a question of first impression, that the Commission could not exempt a lot from having to obtain a coastal development permit and yet still retain jurisdiction over another part of that same lot. Under the *Landgate* test, no taking is involved so long as there is an objective and sufficient connection "between the land use regulation in question and a legitimate governmental purpose, so that the former may be said to substantially advance the latter. [Citations.]" (17 Cal.4th at p. 1022.)

Similar to *Landgate*, the present matter essentially involved a clash of wills between the County and the Commission and, to a certain extent, the Buckleys. However, the record does not support a finding that there was anything improper about the Commission's position that the rear portion of the lot was indeed an environmentally sensitive habitat area. Nor is there any support for the proposition the Commission's motives were in bad faith. In any event, as stated in *Landgate*, we are not to look at the subjective motive of the government agency but instead to determine whether objective evidence supports the connection between the regulation and a legitimate purpose. (17 Cal.4th at p. 1022.) As previously stated, the evidence shows that there was indeed a connection between the land use regulation and a legitimate governmental purpose in attempting to control the rear portion of the Buckleys' property.

### f. *Conclusion as to taking*

We conclude that the Buckleys did not establish that the assertion of jurisdiction and denial of the grading permit was either a permanent or a temporary taking. There was, therefore, no basis for the trial court's award of damages, which is reversed.

### 4. *The Buckleys are not entitled to attorney fees*

 Code of Civil Procedure section 1036 provides: "In any inverse condemnation proceeding the court rendering judgment for the plaintiff by awarding compensation . . . shall determine and award or allow to the plaintiff, as a part of that judgment . . . a sum that will, in the opinion of the court, reimburse the plaintiff's reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of that proceeding in the trial court or in any appellate proceeding in which the plaintiff prevails on any issue in that proceeding."

Inasmuch as we have reversed the compensation award because the evidence did not support a taking, we must reverse as well the $831,494.76 in attorney fees, appraisal fees and costs awarded pursuant to section 1036 of the Code of Civil Procedure. (*City of Los Angeles* v. *Property Owners* (1982) 138 Cal.App.3d 114, 121 [187 Cal.Rptr. 667], review den. and cert. den.) Under the plain language of the statute, since the Buckleys will not receive a compensation award for inverse condemnation, they are not entitled to attorney fees.

### 5. *The trial court was not biased against the Commission*

The trial court several times used phrases such as "government tyranny" and "tyrannical behavior" when referring to the acts of the Commission. Despite these statements, our review of the massive record in this case does not indicate that the court was biased against the Commission to the extent that reversal is required on that ground. (Contra, *Catchpole* v. *Brannon* (1995) 36 Cal.App.4th 237 [42 Cal.Rptr.2d 440].)

### DISPOSITION

The judgment in the declaratory relief action (No. BC044916) is affirmed. The judgment in the cross-complaint for damages (No. SC015614) and the award of attorney fees and costs are reversed. Each party is to bear its own costs on appeal.

Boren, P. J., and Zebrowski, J., concurred.

A petition for a rehearing was denied December 28, 1998, and respondents' petition for review by the Supreme Court was denied February 24, 1999. Baxter, J., Chin, J., and Brown, J., were or the opinion that the petition should be granted.