Filed 11/22/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TESORO REFINING & MARKETING COMPANY LLC et al., | B288889 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BS160502) |
| v. | |
| LOS ANGELES REGIONAL WATER QUALITY CONTROL BOARD, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  James C. Chalfant, Judge.  Affirmed.

Meyers, Nave, Riback, Silver & Wilson, Gregory J. Newmark and Viviana L. Heger for Plaintiffs and Appellants.

Xavier Becerra, Attorney General, Robert W. Byrne, Assistant Attorney General, Gary E. Tavetian and  John S. Sasaki, Deputy Attorneys General, for Defendant and Respondent.

## INTRODUCTION

In this appeal, plaintiffs and appellants Tesoro Refining & Marketing Company LLC and Tesoro Socal Pipeline Company LLC (Tesoro) appeal the denial of a writ of mandate seeking to set aside a cleanup and abatement order (CAO) issued by defendant and respondent Los Angeles Regional Water Quality Control Board (Regional Board).[1]

Tesoro alleges that the trial judge erred in two ways. First, Tesoro claims that the administrative record does not contain substantial evidence to support the finding that Tesoro's pipelines were the source of the pollutants. Second, Tesoro, claiming that any such discharge must have occurred before 1970, challenges the imposition of liability as an impermissible retroactive application of the Porter-Cologne Water Quality Control Act of 1969 (Porter-Cologne Act). (Wat. Code, §§ 13000—16104.)[2]

The Regional Board responds that there is substantial evidence to support the trial court's decision. Further, the Regional Board objects to Tesoro's introduction of a new claim of retroactive application in this proceeding. As a threshold matter, the factual question of when Tesoro's pipelines leaked pollutants was never answered because Tesoro never argued to the Regional

---

[1]    Tesoro acquired these pipelines effective June 1, 2013. Tesoro and the previous owners, BP Pipelines (North America), Inc., Atlantic Richfield Company (ARCO) and ARCO Terminal Services Corporation (ATSC), shall be referred to collectively as "Tesoro."

[2]    All further undesignated statutory references are to the Water Code.

Board that this action involved an impermissible retroactive application of the Porter-Cologne Act.  In fact, throughout the administrative process, Tesoro denied that its pipelines were the source of the pollution.  Where, as here, the administrative agency has not determined a factual predicate for a defense such as this one, administrative exhaustion should preclude the argument.  Finally, the Regional Board asserts that even if exhausted, Tesoro's retroactivity argument erroneously limits the definition of "discharge."  The term "discharge" must be read to include not only the initial occurrence, but also the passive migration of the contamination into the soil and, ultimately, into the groundwater.

We find that the law and substantial evidence support the trial court's denial of Tesoro's writ of mandate.  Substantial evidence in the administrative record supports the court's independent judgment that Tesoro's pipelines were the source of the contamination addressed in the CAO.  We also find that it would have been futile for Tesoro to argue its narrow definition of "discharge" before the Regional Board, thereby excusing its failure to exhaust.  We also hold that, even if substantial evidence in the record supported Tesoro's factual contention that the initial discharge from its pipelines necessarily occurred before 1970, it would still be an actionable discharge under the Porter-Cologne Act.

## BACKGROUND FACTS

To understand the issues presented here, it is necessary to examine the statutory basis for the challenged order and the facts surrounding the investigation of and enforcement actions taken with the order.

3

A.   The Porter-Cologne Act

Enacted in 1969, the Porter-Cologne Act reflects the public's "primary interest in the conservation, control, and utilization of the water resources of the state," and intends to advance that interest by ensuring the protection of the "quality of all the waters of the state" for the public's use and enjoyment. (§ 13000.)

The Porter-Cologne Act recognizes that the protection of water quality can best be accomplished by statewide regulation with regional administration.  Thus, under the Porter-Cologne Act, the State Water Resources Control Board (State Board) and nine regional boards are the principal state agencies for enforcing state water pollution law.[3]  (See *WaterKeepers Northern California v. State Water Resources Control Bd.* (2002) 102 Cal.App.4th 1448, 1452.)  "Waters of the state," as defined in the Porter-Cologne Act, include "any surface water or groundwater . . . within the boundaries of the state."  (§ 13050, subd. (e).)

Section 13304, subdivision (a) establishes the Regional Board's authority to issue a CAO to any person "who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance."  Upon order of a regional board, the discharger shall "clean up the waste or abate the effects of the waste, or, in the case of threatened

---

[3]   The State Board is solely responsible for setting statewide policy concerning water quality control and is the only entity authorized to promulgate regulations to implement the Act. (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 696.)

pollution or nuisance, take other necessary remedial action."
(§ 13304, subd. (a).) A regional board can order suspected
dischargers to investigate to determine the source of the
pollution. (§ 13267.) A person who objects to the CAO can file a
petition with the State Board to review that action. (§ 13320,
subd. (a).)

>   B.    Tesoro's Pipelines and the Regional Board's
>         Investigation

In November 2009, the Regional Board received notice from
the California Department of Public Health (DPH) regarding an
inquiry from the Wrigley Heights neighborhood in Long Beach,
California. Residents of the Wrigley Heights neighborhood had
expressed concern regarding potential vapor intrusion into
buildings. DPH requested that the Regional Board conduct
further investigation of petroleum hydrocarbon-impacted soils
and groundwater contamination at the Oil Operators Inc. (OOI)
site located nearby.

OOI is a cooperative association of several companies which
operate oil wells in the Long Beach/Signal Hill area. OOI owns a
20-acre parcel of land in the City of Long Beach, which is
bounded by the 405 and 710 Freeways, the Los Angeles River and
Wardlow Road and Golden Avenue. At this site, OOI operated
onsite water treatment facilities to treat production brines and
other fluids recovered during crude oil production. OOI ended all
operations in 1998, and the property has been undergoing de-
commissioning since that time.[4]

---

[4]     The OOI site has been the subject of remediation under the
oversight of the City of Long Beach Department of Health and
Human Services in accordance with a consent decree issued in
the Los Angeles Superior Court in 2002. Full scale remedial

In February 2010, the Regional Board issued a requirement for a technical report pursuant to section 13267 to OOI. The Regional Board ordered OOI to complete onsite and offsite assessments of dissolved groundwater contamination and to determine whether any inhabitants have been potentially exposed to health threats from migrating volatile organic compounds (VOC's) contaminant plumes from the OOI site. Specifically, OOI was to begin sampling groundwater monitoring wells on its site and submit quarterly reports and submit a work plan to delineate fully the lateral and vertical extent of groundwater contamination.

In March 2010, OOI submitted to the Regional Board a proposed work plan and a recitation of current subsurface conditions at the OOI site. In relevant part, the report discloses the existence of benzene in the northern most portion of the property at 45 feet. In addition, the report disclosed the presence of 1,2-dichloroethane (1,2-DCA), an additive that had been used with leaded gasoline, in groundwater. Benzene was also present in the groundwater. Concentrations of both 1,2-DCA and benzene exceeded the state's maximum contaminant levels along the eastern portion of the OOI property.

In May 2010, the Regional Board issued another Requirement for a Technical Report pursuant to section 13267 to OOI. In this report, the Regional Board directed OOI to determine if any offsite inhabitants had been potentially exposed to health threats from migrating VOC's contaminant plumes

---

activities, including bioremediation of the soils under the site, has been ongoing.

beneath the residential properties on the eastern boundary of the OOI site, which was the Wrigley Heights neighborhood.

A plan for additional site assessment by OOI was approved in mid-2011 and a series of reports from that work plan were submitted to the Regional Board. A multi-depth, site-wide soil gas survey was conducted beneath the OOI property and the Wrigley Heights neighborhood. Soil gas samples were tested for VOC's (benzene) and methane. High concentrations of benzene in soil gas were found to be coincident with higher concentrations of benzene in the underlying groundwater. The higher level of benzene in soil gas also appeared correlated with buried petroleum (gasoline) pipelines on the eastern boundary of the OOI site. In addition, the groundwater flow direction onsite was established to be to the north-northwest. The observed groundwater flow direction along with the pattern and distribution of contaminants within the groundwater indicated an offsite source to the east of the OOI property.

The presence of benzene and 1,2-DCA, the location of that contamination on the eastern boundary of the OOI site and the general groundwater flow direction led the Regional Board to suspect that there had been a gasoline discharge. And, the location and distribution of the groundwater contamination suggested that the source of that discharge was located along Golden Avenue. Based on the groundwater data and their engineering and scientific expertise, staff at the Regional Board narrowed the origination of the discharge to certain pipelines that carried gasoline beneath Golden Avenue.

In January 2012, the Regional Board issued a requirement for technical report on pipeline inventory to two companies— Tesoro and Plains All American Pipeline, L.P. (Plains). Those

7

two companies owned underground pipelines that might have transported gasoline near Golden Avenue. The Regional Board ordered these two companies to provide inventories of their respective pipelines within one mile of the intersection of Baker Street and Golden Avenue in Long Beach and to describe the products that those pipelines conveyed.

The information provided by these two companies provided critical facts to the investigators.[5]

Plains identified seven line segments within the one-mile radius of the investigation area. Plains reported that "all line segments have historically only been in crude oil service." A crude oil leak was not consistent with the type of contamination found at the subject site. Further, the one segment of Plains's crude oil pipelines in the immediate vicinity of the investigation location (Line 52E) was purged and placed out of service for at least the last 12 years.[6]

In Tesoro's response, it identified six pipelines within a one-mile radius of the intersection of Baker Street and Golden Avenue. The Tesoro pipelines crossing nearest to the location of the detected contamination were Lines 32, 34 and 252.

---

[5] Although Tesoro asserts that there were over 10 pipelines in the vicinity of 712 Baker Street, the Regional Board investigated the use, history of operation and release and repair history for these lines. Records from the state fire marshal's office and the City of Long Beach, Department of Public Works showed only Tesoro's pipelines carried gasoline.

[6] Tesoro verified that Plains's Line 252 was a crude oil transport pipeline.

8

Line 252 was initially identified by Tesoro as a wastewater line. Tesoro later changed its description of Line 252 as carrying gasoline until 1953 and then used for wastewater transport thereafter and inactive since 1995. This line is a six-inch pipeline.

Line 32 was an idled 12-inch "crude and refined dark products line." Work was underway to reactivate this line. During an inspection of the line in 2011, some "anomalies (dents) were identified in the vicinity of Baker Street and Golden Avenue," and those areas of Line 32 were "subsequently bolstered with approved pipeline repair methods." Tesoro denied any release from Line 32 at any time.

Line 34 was an active eight-inch diameter diesel and gasoline refined products line. A piece of that line had been relocated/replaced under the Metropolitan Transit Authority rail line in 2010 as a precautionary measure. According to Tesoro, there was no "release of product" and the abandoned section was filled with mud. According to Tesoro, there was no evidence of a release from Line 34. Tesoro denied any release from Line 34 at any time.[7]

Based on these responses, the only pipelines under Golden Avenue that had ever transported refined gasoline belonged to Tesoro.

In response to this information, the Regional Board issued another requirement for technical report to Tesoro. In that order, Tesoro was described as "suspected of being responsible for" a discharge of waste beneath Golden Avenue resulting in "gasoline

---

[7]    Cal Fire records showed the only record of release on this line was a diesel spill in the City of Bellflower in 1990.

type hydrocarbon contamination" in the soil and soil vapor. And, the order directed Tesoro to prepare and submit a work plan to determine the extent of that contamination.

Tesoro responded by claiming that it was not responsible for any gasoline-type hydrocarbon contamination of the soil and groundwater at the site. Tesoro flatly denied any leaks from any of its pipelines at any time. Tesoro noted that Line 32 had not been used for the conveyance of gasoline. And, Tesoro pointed out that Line 34 had passed testing on eight different occasions and that there was "no evidence of a release from Line 34."[8] Tesoro also argued that the Regional Board's data failed to support a finding of gasoline contamination.[9]

The Regional Board requested additional information and analysis be conducted through site sampling in response to

---

[8] Tesoro later amended its answers and reported a 1973 leak from Line 32 near Golden Avenue about one-half mile from Baker Street. The leak was caused by external corrosion. Tesoro also reported a two-barrel leak of "unknown material" from Line 34 in 1990. Again, that leak was caused by external corrosion. The location of that release was unknown.

[9] In response to the Regional Board's order for a soil and soil vapor investigation of the area surrounding its pipelines, Tesoro proposed placing probes at a single location adjacent to Line 32. The Regional Board found that work plan to be deficient and, upon further discussion, Tesoro proposed three sampling locations. The Regional Board asked Tesoro to expand the extent of its proposed investigation to delineate the full extent of hydrocarbon impacts in soil, soil vapor and groundwater on both sides of BP Line 32 and 34. As of November 2012, no such revised work plan was submitted by Tesoro to the Regional Board.

10

Tesoro's arguments. Six water samples and one product sample were tested. These tests revealed the presence of 2,2,4-trimethylpentane (iso-octane, arrowed) and other trimethylpentanes, which are blended into gasoline to increase octane levels. These tests also revealed the presence of n-alkanes, which is suggestive of leaded gasoline. The tests ruled out any heavier petroleum products in the sample. Once again, the only gasoline pipelines in the area were owned by Tesoro.

Unable to assert that the contamination was not from refined products, Tesoro changed its focus and now claimed that OOI's wastewater lines, not Tesoro's gasoline pipelines, were the source of the problem. Citing a 1953 United States Geological Survey (USGS) report, Tesoro asserted that OOI's wastewater treatment facility was the source of the contamination.[10] Specifically, Tesoro suggested that OOI accepted waste from wells and refineries and then discharged that waste via the sewer line or the Los Angeles River discharge line. This refinery waste, Tesoro argued, was the source of the gasoline contamination.

The Regional Board investigated that theory. Business records from OOI failed to corroborate the USGS's description of its waste treatment operations. OOI had no records of refinery waste water going to the site. The Regional Board, however, accepted the possibility that OOI had accepted refinery wastes. However, even if OOI accepted refinery wastes at some point in the past, the soil, soil gas and groundwater data all pointed to the

_____

[10] United States Geological Survey, 1953, Department of the Interior. "Native and Contaminated Ground Waters in the Long Beach-Santa Ana Area, California," U.S. Geological Survey Water-Supply Paper 1136, Washington, D.C., at pp. 71—75.

pipeline corridor as the source of the contamination.  If OOI were the discharger, the data would have looked different.  For example, if OOI had discharged refinery wastes into the Los Angeles River (as Tesoro contended), then the groundwater proximate to the western side of the OOI property would be contaminated.  Tests of this groundwater, however, were negative.  Using this and other facts, OOI's reception of wastewater from refineries was ruled out as a source of the contamination.

The Regional Board issued a further report establishing the basis upon which it concluded that Tesoro's pipelines were "a discharger and responsible party," and directed Tesoro to adopt a "proactive approach and work together with all the stakeholders to address this environmental concern."

Tesoro declined to adopt a "proactive approach," instead asserting a new argument to disprove that it was a discharger.  For the first time, Tesoro claimed that Line 34 did not carry gasoline; it had been dedicated to diesel service since 1946.  This factual claim contradicted the sworn statement originally provided by Tesoro.

Tesoro's claim that Line 34 only carried diesel also failed to comport with other contemporaneous records regarding the pipeline and its uses.  Cal Fire noted that its records showed that Line 34, from the Los Angeles Refinery to Vinvale, was used for refined product service.  A 1975 City of Long Beach pipeline map also showed that Line 34 was in gasoline service.[11]  And, a

_____

[11]  Although Tesoro claimed that the "Gaso" designation on this 1975 City of Long Beach pipeline map generically applied to any refined fuel product and as such could properly designate a diesel pipeline, that argument was unsupported by competent

Western Oil and Gas Association, Long Beach-Wilmington Harbor area, oil handling facility map, updated on January 1973, showed Tesoro as having four-, six-, eight- and twelve-inch diameter "refined products lines."[12] The four- and six-inch lines identify segments of Line 252, the 12-inch diameter line is Line 32 and the eight-inch diameter line is Line 34.

    C.    Cleanup and Abatement Order and Appeal to State Board

In April 2013, the Regional Board issued a "tentative cleanup and abatement order" (TCAO) to Tesoro. The TCAO found that Tesoro was responsible for a discharge of waste at the site and, that as a result of that discharge, elevated concentrations of benzene and other petroleum hydrocarbons were found in the soil and groundwater at the site.

In response, Tesoro submitted extensive comments, adding to the hundreds of pages that it had already submitted to the Regional Board. Although several arguments were made, at no time did Tesoro admit to having caused a discharge from its pipelines at any time—either before or after 1970. "We have no record of gasoline pipeline leaks from any of the three pipelines

---

evidence. A City of Long Beach employee noted that "Gaso" on its 1975 maps referred only to gasoline—not diesel.

[12] Although Tesoro claimed that a Golden Eagle pipeline running along the Golden Avenue corridor on the City of Long Beach map carried gasoline, the Western Oil and Gas Association map does not show any Golden Eagle pipelines running along the Golden Avenue corridor. There are Golden Eagle pipelines on the 1973 map, but they do not run along the Golden Avenue corridor and they are identified as "oil" pipelines, not refined product pipelines.

that [Tesoro] operates under Golden Avenue."  Nor did it identify any other gasoline pipeline that could have been responsible for the contamination at the site.  Rather, Tesoro argued that "[t]he nature of the contaminants and their location points more logically to the operations of the Oil Operators, Inc. site." According to Tesoro, "nearby community residents noticed, and reported to authorities, several vacuum trucks discharging waste [at the OOI site] as late as 2000."

After considering and responding to these comments, the Regional Board issued the final CAO on September 18, 2014.  The Regional Board ruled out "other possible sources of wastes at the site, including the operations of the Oil Operators, Inc. (OOI) site."  And, the CAO noted that "[j]ust because [Tesoro] has no record of gasoline pipeline leaks from any of the three pipelines that [Tesoro] operated under Golden Avenue does not mean that a release did not occur.  A release can occur even if there is no record of it."  Further, the Regional Board accepted the information provided by Tesoro and other available records showing that Lines 32, 34 and 252 collectively transported crude oil, dark refined products, other refined products, including gasoline and diesel fuel, and oily water.

Tesoro filed a petition for review with the State Board. Tesoro argued (again in contradiction with its initial admissions) that its lines were not gasoline lines after 1953 and there was no evidence that they leaked at any time.  For the first time, Tesoro argued that given the historical use of its pipelines for gasoline, the CAO constituted an impermissible retroactive application of the Porter-Cologne Act.  Tesoro argued that the Regional Board was required to make a finding that the discharge at issue here occurred before 1970, even though Tesoro had not asserted that

14

position before the Regional Board and the factual basis for Tesoro's retroactivity argument was contradicted by the company's own admissions and other competent evidence in the record.

The State Board took no action on Tesoro's petition for review, and the petition was deemed denied by operation of law on January 1, 2016.  (See Cal. Code Regs., tit. 23, § 2050.5.)

D.     Tesoro's Writ of Mandate and Trial Court Ruling

Tesoro filed a petition for writ of mandate challenging the Regional Board's issuance of the CAO.

In its petition for writ of administrative mandate, Tesoro argued that the evidence in the record showed that the CAO mandated the remediation of discharges that took place, if at all, long before the Porter-Cologne Act became effective.  Tesoro criticized the Regional Board's failure to make an express finding that the discharge occurred after 1970 as required to avoid an impermissible retroactive application of the Act.[13]  Further, Tesoro argued that a factual finding of a pre-1970 discharge was necessary because "discharge" could not be properly defined to encompass pollution that "continues to occur and expand," as it passes from its original location, through the soil and into the groundwater.  Citing *Lake Madrone Water Dist. v. State Water Resources Control Bd.* (1989) 209 Cal.App.3d 163, 174 (*Lake Madrone*), Tesoro argued that such a definition was contrary to the plain meaning of the word.  Tesoro also argued that even

_____

[13]     In response to the Regional Board's argument that Tesoro had not made this argument before the Regional Board and was, therefore, precluded from raising this issue judicially, Tesoro argued that this jurisdictional question had not been waived, and that further exhaustion would have been futile.

15

under the State Board's definition, the record showed no "discharge" had occurred because recent monitoring data showed that the contaminant concentrations are trending downward.

The trial court issued its decision on the petition on December 12, 2017. The court ruled, based on its independent judgment, that the Regional Board's findings were supported by the weight of the evidence.

The trial court, giving the State Board's interpretation of "discharge" in section 13304 considerable deference, defined that term to encompass not only the initial event but also to include the continuing migration of contaminants "so long as they continue to threaten state waters." This definition, the court found, was based not only on the State Board's expertise in hydrology and in knowing what is necessary to maintain water quality "by ensuring that the activities are encompassed that have an ongoing effect on the quality of the waters of the state," but was consistent with the Act's intent. Thus, the trial court found that the Regional Board had not retroactively applied the Porter-Cologne Act to a pre-1970 discharge.[14]

---

[14] The trial court rejected the Regional Board's claim that Tesoro failed to exhaust its administrative remedies by failing to assert before the Regional Board that it was retroactively applying the Porter-Cologne Act. Citing *Buckley v. California Coastal Com.* (1998) 68 Cal.App.4th 178 (*Buckley*), the trial court held that " '[t]he rule of exhaustion of administrative remedies does not apply where the subject matter lies outside of the administrative agency's jurisdiction.' " In this case, Tesoro's contention to the State Board that the discharge occurred prior to 1970 was sufficient to avoid the bar of administrative exhaustion.

The trial court also evaluated the administrative record and concluded, based on its independent judgment, that the Regional Board had fully and fairly investigated all parties, and that the Regional Board properly ruled out other parties as a possible source of the waste. Benzene was in the gasoline transported by Tesoro in its Golden Avenue pipelines, and the maximum benzene concentrations in groundwater were generally consistent with this pipeline corridor. The investigation also discovered 1,2-DCA and iso-octane indicators of gasoline discharge. The highest 1,2-DCA groundwater detections were found in wells close to and downgrade from Tesoro's Lines 32, 34 and 252. The distribution of these gasoline-related chemicals along the eastern edge of the OOI property provided sufficient circumstantial evidence that Tesoro and its pipelines along Golden Avenue were the source of the pollution.

Accordingly, the trial court denied Tesoro's petition and entered judgment in favor of the Regional Board on January 10, 2018.

A timely appeal followed.

## DISCUSSION

A. Standard of Review

Section 13330, subdivision (e) requires the trial court to exercise its independent judgment in reviewing the CAO issued by the Regional Board. The parties both agree that the trial court properly used the correct "independent judgment" standard of review in this case. Thus, on appeal, we review the lower court's factual determinations under the substantial evidence standard. (*Coastal Environmental Rights Foundation v. California Regional Water Quality Control Bd.* (2017) 12

17

Cal.App.5th 178, 190.)  Questions of law and the lower court's legal determinations are reviewed de novo.  (*Ibid.*)

>        B.      Substantial Evidence Shows Other Possible Sources
>                of Gasoline Contamination Were Ruled Out.

Tesoro's first contention on appeal is that the trial court's finding of Tesoro's pipelines as the source of the gasoline contamination in this instance is not supported by substantial evidence in the record.  Specifically, Tesoro asserts that the Regional Board's investigation failed to "rule out" other possible sources of gasoline contamination.

The trial court, based on its independent judgment, reached the conclusion that Tesoro was responsible for the waste discharge and that the Regional Board had fairly investigated whether OOI or other pipeline operators might be responsible for the waste at the site and had properly ruled them out.

The circumstantial evidence in support of this conclusion is overwhelming.  The tests conducted on soil, soil gases and groundwater at the site point clearly in the direction of gasoline as the source of the pollution.  These tests detected 1,2-DCA, iso-octanes and n-alkanes, common additives used in the production of gasoline.  In addition, these tests failed to show the presence of any heavier-end hydrocarbons, indicative of crude oil.  The groundwater data also showed that the benzene concentrations were highest along the immediate vicinity of Golden Avenue, and lower at locations farther away.  Thus the plume was roughly centered at and aligned with Golden Avenue, between Baker Street and where Golden Avenue veers southeast.  Soil vapor data indicates a track of benzene near Tesoro's Pipelines 32, 34 and 252, and the pattern of the benzene demonstrates a pattern of an older near-surface release for which the center of the mass

has migrated downward—thus rebutting Tesoro's theory that the waste was released from a deeper source. Tesoro admitted that Line 34 operated in this Golden Avenue corridor, and carried refined gasoline and reformulated gasoline in its pipelines during the relevant period. Tesoro's initial admission of how it used Line 34 was corroborated by other records, including a City of Long Beach pipeline map and a Western Petroleum Association map showing that this pipeline transported gasoline in the 1970's.

And, despite considering and studying the issue, the Regional Board found no other source of gasoline contamination. OOI had no records of ever handling waste from gasoline refineries, despite a contrary statement contained in a description of OOI's operations in a 1953 report of the USGS. Further, that version of historic events—that OOI processed refined waste products and dumped them in the Los Angeles River—would not have created the contaminated soil and groundwater patterns found on the Golden Avenue corridor. Further, Tesoro's claim that the release was from a source other than its pipelines failed to find support in the pattern of benzene contamination in the soil and soil vapor. Finally, the uncontroverted information in the record is that Plains's Line 52 transported only crude oil. The Regional Board's testing of the soil and groundwater in the Golden Avenue corridor ruled out crude oil as the source of the contamination.

This circumstantial evidence constitutes more than sufficient evidence upon which the trial court could reasonably infer that there was a gasoline discharge along the Golden Avenue corridor and that the discharge came from Tesoro's pipelines.

C. Tesoro's Failure to Exhaust the Allegation that the Discharge at Issue Here Occurred Before 1970 that Lies at the Heart of the Retroactivity Argument Is Excused.

The factual predicate upon which Tesoro's entire retroactivity argument rests—i.e., that the discharge from its pipeline occurred only before 1970—was never determined by the Regional Board. Tesoro never admitted that its pipelines leaked gasoline but that these leaks occurred before 1970. Nor, as a corollary to that admission, did Tesoro assert that the CAO constituted a retroactive application of the Porter-Cologne Act in any of its numerous and voluminous submissions. Even after the tentative CAO was issued, and the Regional Board invited Tesoro to "ensure that all evidence and comments that you wish staff and/or the Executive Officer to consider," Tesoro did not argue that section 13304 was being impermissibly applied to a pre-1970 discharge. The Regional Board was never presented with that argument and, as a result, the CAO includes no findings on that issue.

Tesoro's failure to raise this argument is understandable. To have claimed a pre-1970 initial discharge would have required a repudiation of Tesoro's numerous denials of *any* discharges from its pipelines. Tesoro's failure to assert this argument, however, has resulted in a paucity of evidence in the administrative record to support its claim that the discharge at issue here occurred before 1970. In fact, the record contains substantial evidence that might have supported the Regional Board reaching a very different conclusion. Tesoro's pipelines carried gasoline along the Golden Avenue corridor well into the 1970's. And, although the samples suggested leaded components

20

to the gasoline as the source of the pollution at the site, leaded gasoline was in use well after 1970. The weathered nature of the benzene suggests a historic discharge, but does nothing to suggest how many years ago the discharge occurred. The record also establishes that Tesoro made repairs and experienced discharges from certain of these pipelines after 1970. This evidence, had the issue been raised, could have supported a finding that the initial discharges occurred after 1970 and that the CAO at issue here is not a retroactive application of the Porter-Cologne Act.

As there were no arguments asserted and no findings made regarding the timing of the initial leak from Tesoro's pipelines, the question of retroactivity is somewhat hypothetical. The Regional Board objects to Tesoro being allowed to make a retroactivity argument to the trial court because that defense and its factual predicate were not administratively exhausted. The trial court excused Tesoro's failure to exhaust because " '[t]he rule of exhaustion of administrative remedies does not apply where the subject matter lies outside the administrative agency's jurisdiction.' " We agree that the exhaustion doctrine does not preclude a judicial determination of Tesoro's retroactivity argument, but reach that conclusion on different grounds.

A party aggrieved by a decision of an administrative agency must exhaust all available administrative remedies before seeking judicial review of that decision. (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1080.) The doctrine of exhaustion of administrative remedies precludes judicial review of issues, both legal and factual, that could have been raised but were not raised, at the administrative level. (*Coalition for*

*Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1197.)  The exhaustion requirement is not a matter of judicial discretion; it is a jurisdictional prerequisite to resort to the courts.  (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 293.)

The exhaustion doctrine is principally grounded on concerns favoring administrative autonomy and the idea that courts should not interfere with an agency determination until the agency has reached a final decision.  (*McAllister v. County of Monterey* (2007) 147 Cal.App.4th 253, 275.)  Of equal importance is the notion that courts should not intervene in an administrative dispute until the expertise of the administrative agency can be employed to develop a complete record.  (*Ibid.*)  There are, however, exceptions to the exhaustion doctrine.  (*Ibid.*)

One such exception exists where a party claims that the subject matter lies outside of the administrative agency's jurisdiction.  (*McAllister v. County of Monterey, supra,* 147 Cal.App.4th at p. 275; see also *Buckley, supra,* 68 Cal.App.4th 178.)  Tesoro argued to the trial court that it was not required to exhaust its claim that the discharge at issue in this proceeding had occurred before 1970 and, therefore, was barred because that argument essentially claimed that the Regional Board did not have subject matter jurisdiction.  The trial court agreed.

That ruling was erroneous as a matter of law.  In *Buckley*, the question was whether the Coastal Commission could enforce a permitting scheme over the portion of a lot that was legally exempt from the permit requirement.  (See *Buckley, supra*, 68 Cal.App.4th at 189.)  The plaintiffs were not required to exhaust a claim over which the Coastal Commission had no authority in the first instance.  (*Id.* at pp. 189—190.)  There was no factual

22

dispute between the Coastal Commission and the plaintiffs—the only question was one of law, i.e., the Commission's legal authority to take any action regarding the front part of Buckley's lot.

Unlike in *Buckley*, Tesoro's claim that the Regional Board acted outside of its jurisdiction depends upon a resolution of a contested factual issue. Tesoro's argument regarding the proper statutory interpretation of the term "discharge," rests on the contention that the initial discharge causing the contamination of the soil and groundwater on the Golden Avenue corridor occurred before 1970—a factual allegation that was subject to dispute and that was never determined by the Regional Board. It was never adjudicated by the Regional Board because the claim of retroactivity and its factual predicate were never raised by Tesoro. In fact, Tesoro consistently denied ever having discharged any gasoline from its pipelines—at any time.

Where, as in this case, the jurisdictional question rests on disputed facts, administrative exhaustion precludes the litigation of those facts for the first time in court. (See *United States v. Superior Court of Los Angeles County* (1941) 19 Cal.2d 189, 196.) This requirement serves the intended purpose of the exhaustion of administrative remedies—"to reduce the burden on courts while benefiting from the expertise of an agency particularly familiar and experienced in the area." (*Styne v. Stevens* (2001) 26 Cal.4th 42, 55 & fn. 6, 58.) The Regional Board has far more expertise in chemistry, soil and soil gases, hydrology and other scientific areas than the court. These experts are uniquely qualified to determine the origin and timing of the discharge of gasoline from Tesoro's pipelines, or to admit an inability to marshal sufficient facts and, thereafter, to construe the definition

23

of "discharge" to encompass a historic contamination that continues to pollute soils and groundwater. (*Morton v. Superior Court* (1970) 9 Cal.App.3d 977, 982 ["It lies within the power of the administrative agency . . . to determine, in the first instance and before judicial relief may be obtained, whether a given controversy falls within its granted jurisdiction."].)

One of Tesoro's other claimed reasons for not asserting its retroactivity argument in the administrative proceeding, however, provides a legal excuse for that failure. Tesoro claims that it would have been futile to adjudicate the date on which the initial discharge occurred to argue that the law was being applied retroactively. We agree.

Futility is a narrow exception to the general rule requiring exhaustion of administrative remedies. (*Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 418.) It applies only where the petitioner can " ' "*positively state*" ' " that the agency had " ' "declared *what its ruling will be in a particular case.*" ' " (*Id.* at p. 418, italics in original; *Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd., supra,* 35 Cal.4th at p. 1081.)

In this case, the Regional Board listened, extensively researched and carefully considered the myriad of arguments made by Tesoro during this investigation. And, while it never was called upon to declare what its ruling would have been if Tesoro had admitted a pre-1970 discharge from its pipelines, the Regional Board would have been bound by over 40 years of State Board precedents in defining discharge. In *In re Atchison, Topeka and Santa Fe Railway Company* (Order No. WQ 74-13, Aug. 15, 1974) 1974 Cal. Env. Lexis 2 at p. *9 (Cal.St.Wat.Res. Bd.) (*Atchison, Topeka*) and in two other cases thereafter, the

24

State Board held that a continuous and ongoing movement of contamination from a source through the soil and into the groundwater is a discharge to waters of the state and subject to regulation. (See *In re Zoecon Corp.* (Order No. WQ 86-2, Feb. 20, 1986) 1986 Cal. Env. Lexis 4 at p. *3 (Cal.St.Wat.Res.Bd.) (*Zoecon Corp.*); *Atchison, Topeka, supra,* 1974 Cal. Env. Lexis 2 at p. *9; see also *In re Spitzer* (Order No. WQ 89-8, May 16, 1989) 1989 Cal. Env. Lexis 11 at p. *17 (Cal.St.Wat.Res.Bd.) (*Spitzer*) ["[D]ischarge continues as long as pollutants are being emitted at the site."].) In fact, it cited to this precedent as the basis for the order.

While not having made an express determination of the issue, the Regional Board viewed the pollution at the site as possibly resulting from an older, but ongoing discharge. For example, Line 252 had stopped carrying gasoline in 1953. If this line had been the original source of the waste, the Regional Board necessarily, although not expressly, held that migration of waste from that pipeline through the soil and into the groundwater below supported the imposition of liability on Tesoro, even if the pipeline initially ruptured before 1970.

As it would have been futile for Tesoro to assert the factual bases and to present a legal argument in support of its retroactivity claim, that omission is excused.

D. The State Board's Definition of Discharge Is Correct.

Tesoro agrees that, if the State Board's interpretation of the term "discharge" as used in section 13304 is correct, then the findings in the CAO establish that there is an ongoing discharge of waste at the site. Tesoro's only argument is that the State Board's interpretation of that term is wrong.

25

The State Board has defined the term "discharge" in this statutory provision consistently for the past 40 years to refer to the entire time during which the discharged waste remains in the soil or groundwater and continues to impact or to threaten the groundwater. (See *Zoecon Corp., supra*, 1986 Cal. Env. Lexis 4 at p. *3; *Atchison, Topeka, supra,* 1974 Cal. ENV. LEXIS 2 at p. *9; see also *Spitzer, supra,* 1989 Cal. Env. Lexis at p. *17 ["[D]ischarge continues as long as pollutants are being emitted at the site."].)

As stated in those decisions, discharge refers to any movement of waste from soils to groundwater and from contaminated to uncontaminated groundwater, and continues to occur if the waste continues to move through the soils and groundwater and poses a threat of further degradation to groundwater. (*Atchison, Topeka, supra*, 1974 Cal. Env. Lexis 2 at p. *9.) An actionable discharge, therefore, encompasses not simply the initial episode of contamination, but rather includes the time during which the waste uncontrollably flows or migrates from its source, through the soil, and into and within the groundwater. (See *Zoecon Corp., supra*, 1986 Cal. Env. Lexis at p. *3; *Atchison, Topeka, supra*, 1974 Cal. Env. Lexis at pp. *9—*10.)

Where agencies interpret statutes within their administrative jurisdiction, such rulings constitute " 'a body of experience and informed judgment to which courts . . . may properly resort for guidance.' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12—14.) Judicial deference is particularly appropriate in cases, such as the one here, where the agency has " 'expertise and technical knowledge' " and " 'has consistently maintained the

26

interpretation in question.' "[15] (*Id.* at pp. 12—13.) (See also *DiGiorgio Fruit Corp. v. Department of Employment* (1961) 56 Cal.2d 54, 61—62 ["Consistent administrative construction of a statute over many years . . . is entitled to great weight and will not be overturned unless clearly erroneous."]; *Communities for a Better Environment v. State Water Resources Control Bd.* (2003) 109 Cal.App.4th 1089, 1107 ["[W]e extend considerable deference to an administrative agency's interpretation of its own regulations or the regulatory scheme which the agency implements or enforces. The agency's interpretation is entitled to great weight unless unauthorized or clearly erroneous."].)

Going beyond judicial deference to the agency's long-standing administrative construction of its statutes, we find that the Regional Board's definition of discharge to include ongoing movement of contaminants through the soil and into the groundwater is consistent with the plain language of the statute (See *Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [In determining the intent of the Legislature, " '[the] court turns first to the words themselves for the answer.' "].) In *Lake Madrone, supra,* 209 Cal.App.3d at page 174, the court determined that "the ordinary import" of the term "discharge" is

---

[15]     Tesoro's contention that this interpretation is "jurisdictional," and ought, therefore, to be accorded little weight is without merit. The statutory interpretation issue here does not concern the scope of the agency's jurisdiction. Section 13304 clearly confers jurisdiction on the Regional Board to issue CAO's with regard to ongoing discharges of waste into waters of the state. The question posed by the definition of "discharge" is simply whether the Regional Board's findings in this case support the existence of such an ongoing discharge.

" 'to relieve of a charge, load or burden; . . . to give outlet to; pour forth.' " That definition is entirely congruent with the definition used by the State Board in this case. Where, as here, a pipeline leak puts forth or emits gasoline into the soil, and that unremediated gasoline waste continues to pour forth or to emit chemicals forming a toxic plume that actively threatens to pollute otherwise uncontaminated groundwater, the term "discharge" necessarily encompasses this entire period.

Tesoro's argument that the discharge ends at the moment the waste is released into the soil was not mandated by *Lake Madrone*. As correctly noted by the trial judge, the issue presented in *Lake Madrone* was when the discharge began, not necessarily when it ended. Further, using the definition used in *Lake Madrone*, discharge is properly interpreted to embody the entire period during which pollution is introduced into the environment and thereafter actively migrates so as to threaten to pollute or to pollute groundwater.

Tesoro's reliance on *Consumer Advocacy Group, Inc. v. Exxon Mobil Corp.* (2002) 104 Cal.App.4th 438 (*Consumer Advocacy*) is misplaced. In that case, the court addressed the meaning of Proposition 65 and its provision that no business shall knowingly "discharge or release" a chemical known to the state to cause cancer or reproductive toxicity where it passes or probably will pass into a source of drinking water. And, the question presented was whether passive migration of prohibited chemicals from soil to groundwater would constitute a separate "discharge or release." (*Id.* at p. 450.) *Consumer Advocacy* did not consider or address the issue of whether, under Proposition 65 or any other law, the migration of chemicals within the soil thereafter contaminating groundwater may be considered part of

28

a single, continuous discharge of those chemicals from their source. In that case, in fact, there was no evidence that the chemicals had moved out of a confined space when they simply moved from "one point to another" within soil. (*Consumer Advocacy*, at p. 450.) As those facts are clearly distinguishable from the facts presented here, *Consumer Advocacy* provides no support for Tesoro's argument.

Nor does the State Board's definition of "discharge" conflict with *People ex. rel Younger v. Superior Court of Alameda County* (1976) 16 Cal.3d 30 (*Younger*). In *Younger*, the Supreme Court held that a deposit of oil, for purposes of determining a penalty amount under section 13350, occurs on the day that the oil was deposited and not on each day the oil remains in those waters. (*Id.* at p. 44.) The statutory term, statutory scheme, and overall purpose of the statute in that case are entirely different from the situation presented in this appeal.[16] In fact, the relevant statute in this appeal, section 13304, uses both the terms "deposit" and "discharge" in authorizing the issuance of a CAO. Were these terms synonymous, there would have been no need for them both to be used. At least for section 13304, therefore, "deposit" and

---

[16] Section 13350 was created to deter chronic or continuous violations, i.e., whether a person causes a single oil spill that continues for multiple days, or separate spills on multiple days. (*Younger, supra,* 16 Cal.3d at pp. 43—44.) This deterrent purpose was best effectuated by imposing liability for each day on which oil was actually deposited in the waters of the state. (*Id.* at p. 44.) In this case, however, section 13304 does not impose a monetary penalty and its purpose is not simply to deter continuous or chronic dischargers. Its purpose is to ensure the effective remediation of discharges of waste that impact or threaten to impact state waters.

"discharge" must be construed as referring to something different.  (See *Moyer v. Workmen's Comp. Appeals Bd., supra,* 10 Cal.3d at p. 230 ["a construction making some words surplusage is to be avoided].")

Nor does the State Board's definition of discharge to include the continuous action of passive migration of contaminants through the soil and into groundwater fail to harmonize with the federal Comprehensive Environmental Response Compensation and Liability Act (CERCLA) case law. CERCLA imposes liability for response costs and damages associated with certain "releases" or "threatened releases" of hazardous substances.  (42 U.S.C. § 9607(a).)  In *Carson Harbor Village, Ltd. v. Unocal Corp.* (9th Cir. 2001) 270 F.3d 863, 887 (*Carson Harbor*), the court held that passive migration of contaminants through soil is not "disposal" within the meaning of 42 United States Code section 9607(a).  That holding, however, concerned different language appearing in a different statute. The term "disposal" is entirely absent from section 13304.  And, as with *Consumer Advocacy*, the court in *Carson Harbor* addressed only whether the migration of contaminants through the soil—in and of itself—was actionable.  In CERCLA, the mere disposal of hazardous substances does not give rise to liability unless the disposal results in an actual or threatened release into the environment.  (*Pakootas v. Teck Cominco Metals, Ltd.* (9th Cir. 2006) 452 F.3d 1066, 1077.)  Moreover, to the extent that CERCLA is relevant to the statutory construction question presented here, the term "release" as used in that federal statutory scheme has been interpreted to include the passive migration of hazardous substances.  (*Id.* at p. 1075.)  In *Pakootas*, the Ninth Circuit held that the subsequent leaching of hazardous

30

substances into the environment, after the defendant had disposed of the substances in the Columbia River, was a release within the meaning of CERCLA. (*Id*. at pp. 1068–1069.)

The Regional Board's application of the State Board's definition of "discharge" to encompass a continuous process— from initial leak to the ongoing process of contaminating soils and groundwater through the process of migration of toxic chemicals into a plume from pipeline to groundwater—will best attain the legislative purpose of the Porter-Cologne Act. (See *Select Base Materials v. Board of Equal.* (1959) 51 Cal.2d 640, 645 ["The fundamental rule of statutory interpretation is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law."].)

The purpose of section 13304 is to authorize a regional board to issue a CAO to any person "who has caused or permitted . . . any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state." (§ 13304, subd. (a).) As these words amply demonstrate, the Legislature sought to address the discharge of waste into the waters of the state—including the groundwater. As the preamble to the Act states, "[t]he Legislature finds and declares that the people of the state have a primary interest in the conservation, control, and utilization of the water resources of the state, and that the quality of all the waters of the state shall be protected for use and enjoyment by the people of the state." (§ 13000.)

The State Board's interpretation of the term "discharge," as referring to the entire flow of the discharged waste from its origin to the groundwater advances the legislative purpose of protecting the quality of the water of the state. By contrast, the truncated construction of discharge proposed by Tesoro, i.e., to focus only on

31

the initial release of the waste, would frustrate the Legislature's express intent.  By leaving—as is the case here—a plume of uncontrolled contamination currently threatening the groundwater of the state unaddressed, Tesoro's proposed definition fails to effectuate the purpose of section 13304.[17]

---

[17] Tesoro's argument that the legislative history of section 13304 supports a narrow interpretation of "discharge" is based, in part, on a portion of a letter written by the State Board to the California Manufacturers Association.  That letter sought to clarify when a "threatened discharge" from runoff from a mine could be claimed; it offered nothing by way of explanation as to when a past discharge ended.  It is this latter question that is at issue in this appeal.  As for the statement to the Assembly Committee on Health (ACH), the State Board's recognition that a discharge of waste into a small space, such as a ditch, may end once the waste is poured or dumped in no way conflicts with discharge being defined to encompass an entire migration of discharged waste from its origin, through the soil and into and within groundwater.  Where discharges are transitory or have a broken flow path between the point of discharge and the point of pollution, it might be argued that current law would not reach that situation.  In the present case, however, the substantial evidence in the record showed an uninterrupted flow of waste to groundwater.  The Board's observations to ACH, therefore, have no application to this case.

**DISPOSITION**

The judgment is affirmed.  Respondent shall recover its costs on appeal.

**CERTIFIED FOR PUBLICATION**

JONES, J.*

We concur:

EDMON, P.J.

DHANIDINA, J.

---

\*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

33